IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,     )
                              )
          Plaintiff,         )
                              )
      v.                   )       Criminal Action No.
                              )       13-00224-01-CR-W-DW
JULIAN MITCHELL,         )
                              )
          Defendant.      )

## REPORT AND RECOMMENDATION TO DENY
## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Before the court is defendant's motion to suppress all evidence seized from the search of a Ford Escape and his apartment on June 11, 2013, on the ground that the search of the vehicle was not a lawful search incident to arrest, and the reliance on defendant's mother's consent to search the apartment after he (while present) had refused consent is misplaced. I find that defendant has no standing to challenge the search of the rental car, the seizure of the evidence from the car was valid pursuant to the automobile exception and the inevitable discovery doctrine, and law enforcement officers were justified in relying on Ms. Mitchell's consent to search the apartment. Therefore, defendant's motion to suppress should be denied.

## I.     BACKGROUND

On June 11, 2013, deputies executed a warrant for defendant's arrest. Defendant was a passenger in a vehicle in the parking lot of 3218 St. John Avenue, the address of his apartment building. After placing defendant in custody and removing the driver from the vehicle, officers conducted a search of the front passenger seat and discovered a large amount of cash in the glove compartment of the vehicle. Either at

the time of his arrest or while at the police station, defendant was asked for consent to a search of his apartment.  He said he wanted to think about it.  In the meantime, detectives sought and obtained consent to search the apartment from defendant's mother who indicated that she had complete access to all areas of the apartment.  Law enforcement officers located a firearm, ammunition and mail addressed to defendant.  A drug dog was brought to the scene and alerted to the front passenger door of the SUV.  At the same time, police received information that the driver of the car had outstanding warrants, and he was arrested.  The car was subsequently searched and $16,900 cash, four cellular telephones, six receipts for cash transactions ranging from $3,000 to $9,900, and rental car documents were recovered.

On June 18, 2013, an indictment was returned charging defendant with one count of possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  On September 24, 2013, defendant filed the instant motion to suppress (document number 26).  On October 23, 2013, the government filed a response (document number 32) arguing that defendant has no standing to challenge the search of the car, the warrantless search of the car was valid pursuant to the automobile exception to the warrant requirement, the search of the car was lawful incident to defendant's arrest, the evidence would inevitably have been discovered, and the search of the apartment was valid pursuant to defendant's mother's consent.

I held a hearing on December 16, 2013.  Defendant was present, represented by Jacquelyn Rokusek.  The government was represented by Assistant United States Attorney Rudolph Rhodes.  The following witnesses testified:

1.    Special Agent Michael Mrachek, Federal Bureau of Investigation

2.    Detective Craig Horalek, Kansas City, Missouri, Police Department

3.    Detective Vernon Huth, Kansas City, Missouri, Police Department

4.    Denise Mitchell, defendant's mother

5.    Julian Mitchell, defendant

6.    Sergeant Eric Greenwell

The following exhibits were admitted:

G. Ex. 1      Avis Car Rental Agreement

G. Ex. 2      Consent to search form

G. Ex. 3      Stipulation of facts

G. Ex. 4      Photo of Ford Escape

G. Ex. 5      Photo of Ford Escape

G. Ex. 6      Photo of Ford Escape

G. Ex. 7      Photo of apartment building

G. Ex. 8      Photo of apartment building and driveway

G. Ex. 9      Photo of apartment 3W

G. Ex. 10     Photo of Glock handgun

G. Ex. 11     Photo of mail addressed to defendant

D. Ex. 1      Video interview

## II.    EVIDENCE

Based on the evidence submitted during the hearing, I make the following findings of fact:

1.      On May 29, 2013, defendant was indicted on federal drug charges in the District of Kansas (G. Ex. 3; Tr. at 32).  An arrest warrant was issued that same day (G. Ex. 3; Tr. at 32).  Defendant was also a person of interest in a homicide investigation (Tr. at 24).  And he was on supervised release for a previous federal drug conviction (G. Ex. 3).  His probation officer, Sharie Rey, identified defendant's home address as 3218 St. John Avenue, Apartment 3W, Kansas City, Missouri (G. Ex. 3).  She did not request that a search of defendant's residence be conducted in relation to his supervised release (G. Ex. 3).

2.      On June 11, 2013, at approximately 12:40 p.m., FBI Special Agent Michael Mrachek, Detective Craig Horalek, and other law enforcement officers were conducting surveillance approximately one block east of 3218 St. John, defendant's residence (Tr. at 5, 14, 22).  Special Agent Mrachek had spoken with defendant's probation officer to find out where defendant lived (Tr. at 18).  Special Agent Mrachek had seen pictures of defendant and was conducting surveillance in the area of defendant's home in an attempt to execute the arrest warrant (Tr. at 6).

3.      At approximately 1:20 p.m., Special Agent Mrachek and Detective Horalek observed a white Ford Escape pull into the apartment driveway and pull to the back of the apartment building (Tr. at 6, 14, 22).  They communicated the arrival of the Ford Escape to officers who were watching the back of the apartment building (Tr. at 6).

4.      Deputy U.S. Marshal Jason Thomas was able to observe defendant and his mother, Denise Mitchell, come from the area of the Ford Escape (Tr. at 7).  Deputy Thomas watched Ms. Mitchell walk up the stairs of the 3218 St. John Avenue address and enter Apartment 3W without knocking (G. Ex. 3).  Less than a minute later, she

came back outside and gestured toward the north parking lot where the white Ford Escape was parked (G. Ex. 3). Deputy Thomas watched defendant walk up the stairs, he appeared to say something to his mother, and then he descended the stairs while Ms. Mitchell re-entered Apartment 3W (G. Ex. 3).

5. Meanwhile, the other surveillance units, including the car in which Detective Horalek and Special Agent Mrachek were located, pulled their cars into the parking area where the white Ford Escape was parked (Tr. at 7, 22). Detective Horalek pulled his car up near the Escape, and he and Special Agent Mrachek got out of the car (Tr. at 7, 22). Special Agent Mrachek was wearing an FBI protective vest with FBI markings (Tr. at 7). He observed that defendant was in the front passenger seat of the Escape and another man was in the driver's seat (Tr. at 7; G. Ex. 3). Special Agent Mrachek approached the front passenger door, opened it, got defendant out, and took him to the area by the rear wheel on the passenger side of the vehicle where defendant was then handcuffed (Tr. at 8, 22-23). At the same time, other officers were approaching the driver's door (Tr. at 8). Special Agent Mrachek told Detective Horalek to check the area where defendant had just been sitting (Tr. at 8). Defendant was taken into custody at approximately 1:25 p.m. (Tr. at 15).

6. While Detective Horalek entered the car through the front passenger door from where defendant had just been removed, other law enforcement officers were requesting the driver of the vehicle, Willie Pittman, to get out of the car (Tr. at 23). As Mr. Pittman was getting out of the car, Detective Horalek entered the car to check the passenger seat area for any weapons and to make sure the car was in "park" so that the driver could not move the car (Tr. at 23-24, 28). Detective Horalek has been

5

involved in hundreds of arrests of people suspected of illegal drug activity, and he has learned that firearms are a "tool of trade" for drug traffickers (Tr. at 25, 32). Because the passenger area of the car had been in defendant's wing span and Mr. Pittman was still in the car, Detective Horalek was looking for weapons to ensure officer safety (Tr. at 25, 28).

7.      While defendant was standing at the rear wheel area of the car with Special Agent Mrachek and Willie Pittman was standing in the doorway of the driver's door and facing the car, Detective Horalek looked underneath the passenger seat, in between the seat and the console area, the door console, and the glove compartment (Tr. at 26, 28). Inside the glove compartment, Detective Horalek observed a bank bag which appeared to be empty because it was thin (Tr. at 26). He did not feel any weapons inside (Tr. at 26). He also observed a plastic bag similar to a grocery bag (Tr. at 26). He opened it and looked inside and found a bundle of cash (Tr. at 26). At the time Detective Horalek opened the glove compartment of the car, neither defendant nor Mr. Pittman had access to it due to their locations (Tr. at 29).

8.      As Special Agent Mrachek was arranging for the transportation of defendant to police headquarters, he was informed that cash had been found in the glove compartment by Detective Horalek (Tr. at 10-11).

9.      Defendant was placed in the front passenger seat of Detective Horalek's police vehicle (Tr. at 12). Detective Horalek was in the back, and Special Agent Mrachek was in the driver's seat (Tr. at 12). While the car was in the driveway on the side of the building, Special Agent Mrachek asked defendant if he would consent to a search of his apartment (Tr. at 13, 27). Defendant gave no response (Tr. at 13, 17, 27).

Special Agent Mrachek asked again what defendant wanted to do (Tr. at 13). Again, he got no response (Tr. at 13). Special Agent Mrachek said, "Do you want to think about this? We can talk about it at police headquarters." (Tr. at 13, 27). Defendant said, "Yes," and they left the apartment parking lot and headed toward police headquarters (Tr. at 13, 17, 27). They arrived at approximately 1:47 p.m. (Tr. at 15).

10.    Meanwhile, Detective Vernon Huth, who was also a surveillance officer on the scene, went to the back of the apartment building once it was announced to the surveillance team that defendant had been spotted in the white SUV (Tr. at 35). When Detective Huth arrived, Sergeant Eric Greenwell asked him about a consent to search (Tr. at 35). He went to his police car and retrieved a consent-to-search form (Tr. at 35). He then went up the stairs to Apartment 3W (Tr. at 35-36). The outside door was open and through the screen door he observed an older female standing in the apartment (Tr. at 36). Detective Huth, who was wearing a vest which clearly identified himself as a police officer, introduced himself and asked if he could come inside (Tr. at 36, 42). She gave him permission to enter, and the two went to the kitchen table (Tr. at 36, 42). Sergeant Greenwell followed them inside (Tr. at 36, 43).

11.    Detective Huth told Ms. Mitchell that the police would like to search for evidence of firearms, narcotics, or any evidence of a crime (Tr. at 39). Detective Huth asked Ms. Mitchell if she could read and write, and she said she could (Tr. at 36). He asked her if she lived there, and she said she did live there with her son, Julian (Tr. at 38, 43, 84, 87). Detective Huth asked her if she was free to move about the residence, or if there were any areas of the residence in which she was not able to freely move about (Tr. at 39, 84, 87). Ms. Mitchell stated that she had free rein throughout the

apartment, that sometimes she slept on the couch but when Julian was not home she slept in a bedroom to which she pointed (Tr. at 39, 84, 85, 87). There was a mattress on the floor in that room (Tr. at 39). Detective Huth presented her with the consent-to-search form, she read it aloud, and then she signed and dated the form (Tr. at 36). Other officers may have come inside while she was reviewing the form, but she had already signed the form before anyone other than Detective Huth and Sergeant Greenwell came inside (Tr. at 36, 43, 49-50). The form was presented at 1:33 p.m. and signed at 1:35 p.m. (Tr. at 37, 43, 45-46).

12. The part of the form that was read aloud by Ms. Mitchell contained the following:

> I [name, date of birth], freely and voluntarily give my consent to members of the Kansas City, Missouri Police Department to conduct a search of the address in question, 3218 St. John, 3W, Kansas City, Missouri, and seize person, property, item or substance determined by the Kansas City, Missouri Police Department to be relevant either in the matter under investigation or any criminal matter. I further authorize the taking of photographs and the making of video recordings and sketches of the property, items, substance or areas being searched.

> I understand that the Police Department has not obtained a search warrant authorizing this search and that I have a constitutional right to refuse permission to conduct the requested search. I also understand that any evidence found as a result of the search may be used against me in court.

(G. Ex. 2; Tr. at 38, 43).

13. No threats were made to get Ms. Mitchell to sign the consent form (Tr. at 39). No promises were made to her (Tr. at 39). Ms. Mitchell knew her way around the apartment, she went to a cabinet to retrieve a cup and got herself a cup of coffee (Tr. at 47-48). Detective Huth believed her when she said she lived there (Tr. at 47-48). Ms. Mitchell was described as a "very nice lady" and "polite with everything" (Tr. at 49, 84).

14.	Once Ms. Mitchell signed the consent-to-search form, Special Agent Kenyan -- who was part of nine law enforcement officers conducting the search -- found a loaded Glock .45 caliber pistol in a top dresser drawer in the bedroom, along with a piece of mail addressed to Julian Mitchell, 3218 St. John, 3W, Kansas City, Missouri (Tr. at 39-40).  Detective Huth recovered those items (Tr. at 40).  The search was not started until after Ms. Mitchell signed the consent-to-search form (Tr. at 49).  Other officers did not start "filing in" until after the form had been signed (Tr. at 49).

15.	At the conclusion of the search, officers had seized the Glock .45 caliber semi-automatic firearm, 13 rounds of ammunition and the magazine, a piece of mail addressed to Julian Mitchell at the St. John address, and a box containing small plastic packaging commonly used to package narcotics (G. Ex. 2).  Detective Huth and Sergeant Greenwell asked Ms. Mitchell if any of those items which had been seized belonged to her (Tr. at 41, 84).  She said, "No" (Tr. at 41, 84-85).  The officers then left the residence and headed to their office to prepare police reports (Tr. at 41).

16.	Detective Huth did not see defendant on that day and he did not have dealings with what was going on in or around the white SUV (Tr. at 46).  He did not talk to anyone about getting consent to search from the defendant (Tr. at 47).  Detective Huth's role was to attempt to obtain consent to a search of the apartment (Tr. at 46).

17.	Defendant's name is the only one on the lease for apartment 3W (Tr. at 17).  Special Agent Mrachek was not aware of that until shortly before the evidentiary hearing (Tr. at 18).  No one talked to the landlord or saw lease paperwork prior to the search of the apartment (Tr. at 45, 47, 86).

18.	The white SUV had been leased by Willie Pittman (G. Ex. 1; G. Ex. 3).

9

19.     Around 1:50 p.m., officers called for Detective Tony Garcia and his drug dog so that a canine sniff search could be performed (G. Ex. 3).  Around 2:00 p.m., Detective Garcia arrived.  While the drug dog was being walked around the vehicle, officers were running Mr. Pittman's name through a law enforcement database (G. Ex. 3).  Officers learned that Pittman had outstanding local arrest warrants, and he was placed under arrest for those outstanding warrants (G. Ex. 3).  Pittman told officers he had rented the white Ford Escape from Avis in Overland Park, Kansas, that day (G. Ex. 3).

20.     The drug dog conducted a sniff check of the white SUV and alerted positively near the front passenger door (G. Ex. 3).  A subsequent search of the car revealed $16,930 in cash, four cellular telephones, six Wells Fargo transaction receipts for amounts of money ranging from $3,000 to $9,900, and rental car documents (G. Ex. 3).

21.     Defendant's mother, Denise Mitchell, testified that when the officer showed her the consent-to-search form and asked her where she lived, she told him she lived at 210 North Colorado (Tr. at 60).  She said that Detective Huth asked if she had ever slept in this apartment, and she told him she had (Tr. at 60-61).

22.     I find that Ms. Mitchell's testimony regarding her address being 210 North Colorado is not credible because although she testified as if she were certain of her answers, continuing questioning revealed that she was confused.  She gave what sounded like definitive answers that contradicted her earlier answers on just about every topic.

A.      I have a pacemaker.

Q.      Any other issues?

A.      No.

Q.      Do you have any mental health issues?

A.      Yes.

Q.      And what is that?

A.      Schizophrenia.

(Tr. at 53-54).

Q.      Okay.  Now you're aware of the fact that Julian Mitchell had an apartment

on St. John in Kansas City, Missouri, right?

A.      Yes.

Q.      Okay.  And had you ever spent the night at that apartment?

A.      Yes.

* * * * *

Q.      Okay.  So I need to back up a little bit so I can make sure everybody

understands.  You said that you spent the night on St. John in the apartment after you

were released from Gregory Ridge.  How many nights did you sleep in the St. John

apartment?

A.      One.

Q.      And what night was that?

A.      June 11th.

Q.      Of 2013?

A.      Yes.

Q.    The same night following the arrest?

A.    Yes.

Q.    Had you ever slept there prior to that?

A.    No.

(Tr. at 54-55).

Q.    Now, there has been some testimony today about the arrest of Julian

Mitchell.  Do you remember that day?

A.    Yes.

Q.    Okay.  And were you with Julian on that date?

A.    Not when -- not when he got arrested.

Q.    Prior to that, had you been with him?

A.    Yes, ma'am.

Q.    And where . . . did you go in that white SUV?

[Witness describes a trip to Family Dollar store]

Q.    What time had you actually been released from Gregory Ridge Living

Center on June 11th of 2013?

A.    Oh, I'd say around 4:00 or 5:00.  Probably about 5:00.

Q.    5:00 in the morning?

A.    In the evening.

(Tr. at 56-57).

Q.    Okay.  And we're talking about when you were released from Gregory

Ridge.  Were you released on June 10th or June 11th?

A.    June 11th.

Q.      Okay. And so you -- you were at the apartment at Julian's. . . .  When law enforcement talked to you at Julian's apartment . . . [w]hen they spoke to you, had you been released from the living center at that point?

A.      Yes.

Q.      Okay.  And that -- when they spoke to you was approximately 1:30 in the afternoon.

A.      Yes.

Q.      Okay.  And so what time had you been released from the living center that day?

A.      Five o'clock.

(Tr. at 57-58).

23.      Although Ms. Mitchell testified that she never kept any clothing at the St. John apartment, never got mail delivered there, and never invited any guests to that apartment, the officers did not search for women's clothing or mail addressed to Ms. Mitchell before accepting her statement that she lived at that apartment; therefore, that testimony is not relevant (Tr. at 55-56).

24.      Although Ms. Mitchell was asked repeatedly during the hearing whether she was released from Gregory Living Center on the day of defendant's arrest and she repeatedly said she was, she finally testified that she was actually released the day before and spent the night of June 10 at the Colorado residence (Tr. at 64).

25.      Although Ms. Mitchell testified that she does not have a driver's license and has never driven, she had an arrest warrant in 2010 for an unpaid parking ticket (Tr. at 66-67).  Ms. Mitchell agreed that she knows how to read and that she read the

13

consent-to-search form, and she agreed that she is able to use a phone and was able to call Detective Huth to get the room number for defendant's hearing (Tr. at 66-67).

26.     Furthermore, even if Ms. Mitchell had told the officers that she lived at 210 Colorado, her testimony was that she told the officers she had slept at the St. John apartment before and had full rein of that apartment.  Ms. Mitchell also testified that she was confused and did not know what to do, so "I read the paper and I signed it." (Tr. at 62).  She testified that when she read the part about having a right to refuse permission to search, she understood that she did have the right to refuse permission to search (Tr. at 62-63).  Therefore, there is no question that Ms. Mitchell told the officers she had stayed at the apartment before, that she read the paper and signed it, and that when she signed it she understood that she had the option to refuse.

27.     Defendant testified as follows:

On Mother's day in 2013, he picked his mother up from Gregory Ridge and took her to the movies, and she spent the night at his St. John apartment (Tr. at 73).  Other than that, she had never spent the night at that apartment prior to his arrest on June 11 (Tr. at 73).

Defendant and Mr. Pittman were driving Ms. Mitchell to the Family Dollar Store and were planning to go to the Social Security building on June 11 (Tr. at 74-75).  Because Ms. Mitchell had to urinate, they drove back to the St. John apartment building so she could use the bathroom (Tr. at 74-75).  Because Ms. Mitchell did not have a key to the apartment, defendant had to run up and let her in (Tr. at 75).  He left the key with her, and he told her to lock the door after she used the bathroom and to come back to the car (Tr. at 75).

When law enforcement officers went up to talk to defendant's mother, she was on the stairs trying to come down but they stopped her (Tr. at 76). They took her back into the apartment (Tr. at 76).

At no time while defendant was at the scene near his apartment building did any law enforcement officer ask him for permission to search his apartment (Tr. at 76). He was asked while he was in an interview room at police headquarters, and he said he wanted to think about it (Tr. at 76, 79).

When defendant told police during his interview that his mother and fiancé lived with him, he was referring to the Colorado address but he testified that they did not know that was the location he was referring to because "they didn't know about it." (Tr. at 80).

28.     To the extent that defendant's testimony differs from the findings of fact above, I find it not credible. Although defendant testified that the officers stopped his mother from coming down the stairs, all of the officers who testified as well as defendant's mother agreed that she was inside the residence and allowed the officers inside.

29.     Defendant's testimony that when he told police during his interview that his mother and fiancé lived with him, he was referring to the Colorado address but that they did not know that was the location he was referring to because "they didn't know about it," is neither relevant nor credible. What occurred after the fact has no bearing on whether the officers had valid consent to search the apartment. Furthermore, the officers had gotten the St. John address from defendant's probation officer. It is not plausible that defendant would be talking about the Colorado address as his

15

"residence" without so clarifying, when his arrest had just occurred at his residence on St. John, especially in light of the fact that defendant's probation officer was not aware that he had "changed" his residence and now considered his residence to be on Colorado instead of on St. John (even though he readily admits he continued to lease that apartment).

## III.    STANDING

The government argues that defendant has no standing to challenge the seizure of the cash or other items from the car because the car had been rented to Willie Pittman and defendant had no expectation of privacy in the car.

Under United States v. Salvucci, 448 U.S. 83, 86 (1980), defendant bears the burden of establishing Fourth Amendment standing. Defendant must ultimately prove that he had a legitimate expectation of privacy in the automobile from which the cash and other items were recovered. Rakas v. Illinois, 439 U.S. 128, 144 (1978).

In Rakas v. Illinois, the defendants, passengers in a car driven by another, argued that they had standing to assert that a search of the vehicle violated their Fourth Amendment rights by the mere fact that they were legitimately in the vehicle. The Court disagreed, noting, with special import, that the defendants "asserted neither a proprietary nor a possessory interest in the property seized." Id. at 148.

In United States v. Pino, 855 F.2d 357, 360-361 (6th Cir. 1988), the defendant was a passenger in a car rented by another person.  He was arrested after police found cocaine sewn into pillows inside the rental car.  That defendant's challenge to the search of the rental car was unsuccessful:

In the instant case, the record clearly shows that Llera had neither a property nor possessory interest in either the rental car or the pillows. With regard to the rental car, the rental contract, itself, showed that Pino used his credit card to rent the vehicle and that Llera was not listed as an authorized driver of the vehicle. . . . Moreover, Llera did not testify at the suppression hearing which would have permitted him an opportunity to assert that he had either a property or possessory interest in the pillows without having such testimony used against him as an admission during a subsequent criminal trial. In sum, the evidence presented at the hearing does not demonstrate that the district court's factual finding that Llera had no interest in the car or the pillows was clearly erroneous. The district court did not err, therefore, in concluding that Llera did not have fourth amendment standing to challenge the search of the pillows.

(citations omitted).

Similarly, in this case it is undisputed that Pittman rented the Ford Escape. Defendant was not driving it, his name was not on the rental paperwork as an authorized driver, there is no evidence he was ever observed in control of the vehicle. He testified at the hearing yet provided no testimony which would satisfy his burden of proving a possessory or property interest in the car. Therefore, I find that defendant lacks standing to challenge the search of the car and the resulting seizure of the bundle of cash in the glove compartment and the additional cash, cell phones, and money transaction receipts recovered by police.

## IV.   AUTOMOBILE EXCEPTION

The government argues that the search of the car (specifically the glove compartment and the area around the passenger door of the car) was a valid search pursuant to the automobile exception to the search warrant requirement.

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United

States, 389 U.S. 347, 357 (1967) (footnotes omitted).  "One such exception is the automobile exception, which allows law enforcement to 'search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity.'"  United States v. Brown, 634 F.3d 435, 438 (8th Cir. 2011) (quoting United States v. Davis, 569 F.3d 813, 817 (8th Cir. 2009)).  "Probable cause exists where there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'"  United States v. Donnelly, 475 F.3d 946, 954 (8th Cir. 2007) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

Because defendant had been arrested on a warrant for a drug offense and the drug dog alerted positively to the passenger door area, the officers had probable cause to search the car.  United States v. Stringer, --- F.3d ---, 2014 WL 30668 (8th Cir. (Mo.), January 6, 2014), citing United States v. Bloomfield, 40 F.3d 910, 919 (8th Cir. 1994) (en banc).  Police were permitted to search the vehicle and any closed containers therein without a warrant, based on the automobile exception to the Fourth Amendment's warrant requirement.  United States v. Stringer, supra, citing United States v. Ross, 456 U.S. 798, 820-821 (1982).

Even though the search of the glove compartment was conducted before the drug dog alerted positively, the inevitable discovery doctrine would apply to the seizure of that bundle of cash.  If the government "can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . [then] the evidence should be received." Nix v. Williams, 467 U.S. 431, 444 (1984).  For that exception to apply the government must show (1) a reasonable probability that the evidence would have been discovered by lawful means

18

in the absence of any police misconduct, and (2) an active pursuit of a substantial, alternative line of investigation at the time of the constitutional violation. United States v. Allen, 713 F.3d 382, 387 (8th Cir. 2013), citing United States v. Conner, 127 F.3d 663, 667 (8th Cir. 1997). Here, within minutes of removing defendant and Pittman from the car, police called for a drug dog who alerted positively on the car causing the police to conduct a search of the car. The police inevitably would have looked inside the glove compartment during that search. Therefore, had the bundle of cash not been seized from the glove compartment before the drug dog arrived, it would have been seized during the full search of the car after the dog alerted to the passenger door. As a result, the bundle of cash in the glove compartment was lawfully seized pursuant to the inevitable discovery doctrine.

## V.    CONSENT TO SEARCH THE APARTMENT

Defendant argues that his mother's consent to search the apartment was not valid. He argues that because he "was a present and refusing co-occupant," the consent of his mother was not valid pursuant to Georgia v. Randolph, 547 U.S. 103, 106 (2006), which held that "a physically present co-occupant's stated refusal to permit entry . . . render[s] the warrantless search unreasonable and invalid as to him."

The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained. Illinois v. Rodriguez, 497 U.S. 177 (1990); United States v. Matlock, 415 U.S. 164 (1974). The exception for consent "extends even to entries and searches with the permission of a co-occupant whom the

19

police reasonably, but erroneously, believe to possess shared authority as an occupant." Georgia v. Randolph, 547 U.S. at 109, citing Illinois v. Rodriguez, 497 U.S. at 186.

In this case, I find that the consent given by defendant's mother was sufficient for police to search the apartment.

The Supreme Court, in Georgia v. Randolph, clarified its holding as follows:

> Although the Matlock defendant was not present with the opportunity to object, he was in a squad car not far away; the Rodriguez defendant was actually asleep in the apartment, and the police might have roused him with a knock on the door before they entered with only the consent of an apparent co-tenant. If those cases are not to be undercut by today's holding, we have to admit that we are drawing a fine line; if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.

> This is the line we draw, and we think the formalism is justified. So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it. For the very reason that Rodriguez held it would be unjustifiably impractical to require the police to take affirmative steps to confirm the actual authority of a consenting individual whose authority was apparent, we think it would needlessly limit the capacity of the police to respond to ostensibly legitimate opportunities in the field if we were to hold that reasonableness required the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received.

547 U.S. at 121-122.

In this case, there is conflicting evidence about whether and where defendant was asked for permission to search the apartment. The law enforcement officers testified that he was asked while in the police car in the driveway of the apartment building, and he said he wanted to think about it. Defendant testified that he was asked

while at the police station, and he said he wanted to think about it.  In neither scenario does defendant qualify as a "present and objecting co-habitant."

The fact that Ms. Mitchell was not actually a resident of the apartment is not relevant. The law is clear that if the police reasonably believed that she was, her consent is valid.  The evidence establishes that Ms. Mitchell was observed going into the apartment alone (this statement appears in the parties' joint stipulation of uncontroverted facts), she permitted the officers to enter the apartment, she told them she lived at the apartment with the defendant and slept either in the bedroom or on the couch, and she appeared to know her way around the apartment and its contents.  The police reasonably believed that Ms. Mitchell was an occupant of the apartment.

The evidence also establishes that defendant never objected to a search of the apartment.  Even defendant did not testify that he ever objected to a search of the apartment.

There is no evidence that law enforcement officers removed defendant from the scene in order to keep him from objecting to a search of the apartment, and defendant has not made any such allegation.

And finally, the fact that defendant was located in a police car in the parking lot rather than upstairs in the apartment building is in line with the facts of United States v. Matlock, 415 U.S. 164 (1974) -- in that case, the defendant was arrested on the front lawn and was in a police car when officers went to the door of the residence and obtained consent from someone inside the residence who appeared to police to be a co-habitant.  Under those circumstances, the Supreme Court in Georgia v. Randolph has stated that the suspect "loses out."

21

## VI.   CONCLUSION

Based on the above-stated findings of fact and the law as discussed in sections III and IV, I conclude that defendant has no standing to challenge the search of the rental car, the seizure of the evidence from the car was valid pursuant to the automobile exception and the inevitable discovery doctrine, and law enforcement officers were justified in relying on Ms. Mitchell's consent to search the apartment.  Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has 14 days from the date of this report and recommendation to file and serve specific objections.


                              /s/ Robert E. Larsen
                              ROBERT E. LARSEN
                              United States Magistrate Judge

Kansas City, Missouri
January 21, 2014